1

2

3

4

5

6

7

8                                    UNITED STATES DISTRICT COURT

9                               FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   UNITED STATES OF AMERICA,                    No. 2:08-cr-0427-MCE-EFB P

12                   Respondent,

13            vs.                                  ORDER AND

14   LANA LeCHABRIER,                              FINDINGS AND RECOMMENDATIONS

15                   Movant.

16

17        Movant Lana LeChabrier is a federal prisoner proceeding pro se with a motion to vacate,

18   set aside, or correct her sentence pursuant to 28 U.S.C. § 2255.[1]  LeChabrier raises numerous

19   claims which include allegations of due process violations at her trial, malicious prosecution,

20   judicial misconduct, and ineffective assistance of counsel.  Upon careful consideration of the

21   record and the applicable law, it is recommended that LeChabrier's § 2255 motion be denied.

22   **I. Background**

23        **A.  Procedural Background**

24        In an indictment dated September 17, 2008, LeChabrier and four co-defendants were

25   charged with committing one count of health care fraud, in violation of 18 U.S.C. § 1347.  ECF

26   No. 13.  On October 16, 2008, LeChabrier was arraigned on that indictment.  At that arraignment,

27   ────────────────

28   [1]  This motion was assigned, for statistical purposes, the following civil case number: No. 2:12-cv-0011-MCE-EFB.

                                                     1

1    Attorney Joseph Wiseman was appointed to represent LeChabrier and she was advised of the

2    maximum penalties she faced.  ECF No. 975-15 at 4.  Wiseman informed the trial court that

3    LeChabrier had received a copy of the indictment and had reviewed the charge with him.  *Id.*

4    LeChabrier did not object to these statements.  LeChabrier was ordered released pending trial.

5    ECF No. 39.

6          Subsequently, on May 5, 2009, LeChabrier was arrested by the Royal Canadian Mounted

7    Police while trying to enter Canada from the state of Washington.  LeChabrier's pre-trial release

8    was revoked and she was ordered detained pending trial.  ECF No. 974 at 6 & n.1, ECF No. 74.

9    On April 13, 2010, based on LeChabrier's request and a stipulation of the parties, the trial judge

10   appointed attorney Jan Karowsky to represent LeChabrier and relieved attorney Wiseman as

11   counsel of record.  ECF No. 152.

12         On May 20, 2010, the grand jury returned a Superseding Indictment in which LeChabrier

13   and twelve co-defendants were charged with one count of conspiracy to commit health care fraud,

14   in violation of 18 U.S.C. §§ 1347 and 1349 (Count One).  In addition, LeChabrier was charged

15   with three individual counts of health care fraud, in violation of 18 U.S.C. § 1347 (Counts Five,

16   Seven, and Seventeen).  ECF No. 166.  Trial commenced on May 31, 2011 against LeChabrier

17   and two co-defendants.  ECF No. 380.  On July 8, 2011, the jury found LeChabrier guilty on

18   Counts One and Seventeen and found her not guilty on Counts Five and Seven.  ECF No. 465.[2]

19   Immediately after the verdict was rendered LeChabrier filed a § 2255 motion.  The trial court

20   denied that motion without prejudice because it had been filed prior to sentencing and entry of

21   judgment and was therefore premature.  ECF Nos. 638, 670.

22         On July 18, 2011, attorney Jan Karowsky was relieved as counsel of record for

23   LeChabrier.  ECF No. 472.  On August 16, 2011, attorney Kresta Daly was appointed to represent

24   LeChabrier.  ECF No. 492.  On March 2, 2012, LeChabrier, proceeding through counsel, filed a

25   motion for new trial.  ECF No. 629.  That motion was denied on April 5, 2012.  ECF No. 653.

26

27         [2]   The docket entry erroneously reflects that LeChabrier was only found guilty on Count
     One but a review of the actual verdict reflects that the jury also found her guilty on Count
28   Seventeen.

2

On July 12, 2012, LeChabrier was sentenced to the top of the applicable guideline range of 78 months on each of Counts 1 and 17, to be served concurrently, for a total term of 78 months in prison.  ECF No. 706.  That calculation included sentence enhancements recommended in the presentence report for abuse of trust, use of sophisticated means, and attempted flight prior to trial.  ECF No. 767 at 6.  LeChabrier was also assessed restitution in the amount of $247,174.

LeChabrier's counsel filed a notice of appeal on the same day LeChabrier was sentenced. ECF No. 707.  The appeal contained the following claims: (1) the trial court abused its discretion when it denied her motion to continue the trial so that she could obtain the testimony of a handwriting expert; (2) LeChabrier's trial counsel rendered ineffective assistance in failing to obtain a handwriting expert; and (3) the trial court violated her right to a speedy trial.  ECF No. 975-2.  The Ninth Circuit affirmed LeChabrier's judgment of conviction on February 11, 2014. *United States v. Popov*, 555 F. App'x. 671 (9th Cir. 2014).

LeChabrier subsequently filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241 in the United States District Court for the Northern District of California.  The Northern District transferred the matter to this court.  ECF No. 7 in Case No. 14-cv-1624 MCE EFB.  On October 1, 2014, LeChabrier was ordered to show cause why her § 2241 petition should not be re-characterized as a motion pursuant to 28 U.S.C. § 2255.  ECF No. 13.  LeChabrier responded to the order to show cause on October 9, 2014.  ECF No. 32.  The court construed LeChabrier's response as consent to characterize her petition as a § 2255 motion and the docket was corrected accordingly.  ECF No. 36.

## B.  Evidence Introduced at Trial

In the answer, the government includes a summary of the evidence introduced at trial. The court reproduces this summary for background purposes only.

### 1. The Medicare Claims Process

Medicare is a federal government program that provides healthcare insurance coverage to qualifying individuals.  R.T. 633:7-637:23, 648:11-649:14, 1553:10-25.  Physicians providing services under Medicare would apply for and obtain Medicare provider numbers for specific practice locations, identifying the physician, also known as "the provider," as the person providing services and submitting related claims to Medicare.  R.T. 423:5-25; 436:23-

437:13.  A provider could not bill under her own number for services performed if she was not physically present in the service location. R.T. 659:2-15.

**2. LeChabrier's Clinic**

Co-defendant Vardges Egiazarian owned all or part of three health care clinics operating in Northern California from 2006 through 2008.  R.T. 225:12-14; 244:4-5; 245:17-18.  These clinics were located in Sacramento, Richmond, and Carmichael, California, and they operated one after another in sequence.  R.T. 220:7-10; 242:24-243:4; 245:11-13.  All three clinics conducted business in a similar fashion, and each utilized many of the same staff and many of the same patients. R.T. 291:15-20; 243:8-10; 245:14-16; 245:5-7; 247:20-22.  Each clinic was represented to Medicare to be the site of a medical practice belonging to one or more identified physicians.  The Richmond clinic was purportedly the site of practices of LeChabrier and Dr. Derrick Johnson. R.T. 244:12-15.

LeChabrier and Johnson applied for and received provider numbers for the Richmond clinic.  R.T. 491:10-19; 503:2-13.  The enrollment applications included the various Medicare rules the physicians agreed to follow in submitting claims.  See R.T. 663:6-664:17.  Each physician also was required to sign two forms relating to the electronic submission of claims and the electronic receipt of payments on claims.  See R.T. 434:1-7; 440:21-441:5.  Finally, each physician was required to designate a bank account to receive Medicare deposits.  See R.T. 441:6-8.

Neither LeChabrier nor Johnson ever set foot in the Richmond clinic, and neither physician ever had contact with anyone purportedly providing care at the clinic site.  R.T. 743:22-745:11; 841:18-21; 842:5-12.  The clinic's patients were primarily elderly immigrants, unable to communicate with the clinic staff.  R.T. 230:10-22; 231:13-22; 1079:1-10.  Instead, they were paid for attending the clinic. R.T. 319:5-7. Their medical charts were filled with results of examinations, tests, and treatments which were never performed.  See R.T. 238:15-239:20; 281:11-14; 284:1-18.  From March through September of 2007, Medicare deposited approximately $480,000 into accounts opened by LeChabrier and Johnson in payment for services purportedly rendered at the Richmond clinic. R.T. 495:25-496:17; 503:16-504:2.

Irina Giyenko and co-defendant Zoya Belov testified that they both worked at the Richmond clinic.  R.T. 242:24-243:4; 1083:14-16.  They had never met LeChabrier or Johnson, and had not known either of them to ever treat a patient at the Richmond clinic.  R.T. 244:16-22; 1103:4-9; 1102:7-22.  As a regular practice, patient charts were sent from the clinics to Southern California, and then returned with physician signatures. R.T. 251:3-252:1; 252:13-19.

**3. Dr. Johnson Testifies for the Government**

Dr. Johnson testified that prior to his association with the Richmond clinic, he worked for another fraudulent medical practice

4

in Southern California that involved the signing of charts and ordering of tests even though there were no real patients. R.T. 732:8-12. He became involved with that particular clinic through an introduction made by a friend named Dr. McBay. R.T. 731:13-732:7. Thereafter, Dr. McBay introduced Johnson to co-defendant Migran Petrosyan to discuss a similar opportunity. R.T. 739:15-24; 740:7-16. According to Johnson, Petrosyan "was going to open up a practice in [his] name," Johnson was going to obtain "a billing number," and Johnson would "receive 15% of the proceeds." R.T. 741:14-19. This was to be the Richmond clinic. Johnson admitted signing an enrollment application for the Richmond clinic, and admitted opening a bank account for the clinic's proceeds. R.T. 741:24-742:18. He admitted signing blank checks and turning them over to Petrosyan. R.T. 743:18-21. He admitted never visiting the clinic, never treating any clinic patients, and never hiring anyone or even being aware of the identity of any clinic employees.[3] R.T. 743:22-745:11.

Johnson also admitted that Petrosyan would occasionally bring him patient charts from the Richmond clinic for his signature. R.T. 745:16-20; 746:5-22. He said the charts included patient identifying information, a history and physical, and "the results of diagnostic tests." R.T. 747:14-18. He said the charts "looked fraudulent to me. . . . anybody with a background in medicine could look at those and tell that it wasn't correct." R.T. 749:23-750:1. He was concerned by the fact that multiple patients received the same tests: "a lot of the patients got the same battery of tests, which is abnormal looking and statistically doesn't make sense." R.T. 748:4-6. He said he specifically complained to Petrosyan about the nature of the tests being ordered: "a lot of them didn't make sense medically. . . . some of the tests I wanted him to stop doing because I hadn't heard of them and couldn't defend the use of them." R.T. 747:23-25. Johnson said he expressed these concerns because he thought that if the charts could be made to look "more legitimate, that I might not get caught." R.T. 759:16-17.

**4. LeChabrier's Medicare Documents and Bank Records**

The government introduced the Medicare documents establishing LeChabrier's practice at the Richmond clinic, including the Medicare enrollment application (Ferrari Decl., Ex. C [Ex. 401.1]), an Electronic Data Interchange (EDI) enrollment form enabling the electronic submission of claims to Medicare (Ferrari Decl., Ex. D [Ex. 402]) and an Electronic Funds Transfer (ETF) Agreement designating Santa Barbara bank account opened in her name for Medicare deposits (Ferrari Decl., Ex. E [Ex. 403]). The government also introduced Medicare claims data relating to LeChabrier's Richmond provider number showing that approximately $519,000 worth of claims had been submitted, of which Medicare paid a total of approximately $247,000. R.T. 495:25-496:17.

---

[3] Johnson said Petrosyan mentioned a "Dr. Lana" being associated with the clinic. R.T. 751:16-22.

5

The government also introduced a Medicare enrollment application for LeChabrier relating to a clinic located in Burbank, California, as well as claims data relating to that clinic. Ferrari Decl., Ex. F [Ex. 414.1]; R.T. 501:14-502:24. This clinic was associated with co-defendants Petrosyan and Egiazarian, it operated after the Richmond clinic ceased to operate, and Medicare benefits relating to it were deposited into LeChabrier's bank account. See R.T. 947:13-25; 1932:12-1933:5.

The government introduced bank statements and checks pertaining to LeChabrier's Santa Barbara Bank of America account. R.T. 942:13-21; 943:9-12. This account was used to receive Medicare deposits relating to both the Richmond and Burbank clinics. R.T. 947:13-25. With respect to the Richmond clinic, these records showed total Medicare deposits of $248,917.95, and payments to LeChabrier totaling $48,800. R.T. 948:13-949:5. The records showed that LeChabrier generally received $8,000 a month from the Richmond clinic proceeds, and that she generally was paid through in-branch withdrawals from the Bank of America account. R.T. 949:6-25.

**5. LeChabrier's Statement**

Finally, the government introduced LeChabrier's post-arrest statement, given to FBI Special Agent Eric Jensen. Agent Jensen testified that following her arrest, LeChabrier asked to speak to the agents. R.T. 828:4-8. She was advised of her rights and signed a waiver agreeing to make a statement. R.T. 828:14-829:10. LeChabrier told the agents she met Petrosyan after responding to an advertisement in the Los Angeles Times seeking a medical director. R.T. 833:4-23. Petrosyan explained he was "setting up several . . . charitable clinics that were catering to individuals who were Medicare and Medi-Cal recipients." R.T. 835:12-15. LeChabrier agreed to take the job on the spot. R.T. 835:19-21. During the meeting, Petrosyan provided her with "forms [that] would allow him to obtain her Medicare billing number." R.T. 836:2-5. LeChabrier said she signed "the forms giving him authorization to obtain the number." R.T. 836:8-9. LeChabrier further said she opened a bank account for the clinic at a Bank of America branch in Santa Barbara. R.T. 836:16-21. She said that although the account was in her name, she provided all of the checks and account statements to Petrosyan. R.T. 836:24-837:2. She knew the purpose of the account was to receive Medicare payments. R.T. 837:6-9.

LeChabrier said that in the six months after meeting Petrosyan, little happened except he "had her sign some Medicare and Medi-Cal forms." R.T. 837:17-25. She said she requested copies of these forms, as well as a copy of the clinic's business plan, but Petrosyan would not provide them to her. R.T. 838:1-9.

In mid-2007, Petrosyan came to Santa Barbara and presented LeChabrier with approximately two dozen medical charts from the Richmond clinic for her review. R.T. 838:10-23. LeChabrier claimed to be surprised that the clinic was in Richmond as opposed to Los Angeles. R.T. 838:24-839:2. She also claimed the

diagnoses and testing reflected on the charts "were poor." R.T. 839:8-9. She said they included a "hodgepodge" of symptoms and that she felt symptoms listed were "simply an excuse to do the test." R.T. 839:10-13. Nevertheless, she signed the charts. R.T. 840:1-3.

Petrosyan later returned to Santa Barbara with more charts for LeChabrier to review. R.T. 840:6-8. The quality of the charts had not changed, but Petrosyan "pleaded with her" and "charmed her." R.T. 840:14-19. Petrosyan explained "that they wouldn't get paid if she didn't sign the charts." R.T. 840:25-841:1. Again, she signed the charts. R.T. 840:20-22.

LeChabrier said Petrosyan returned to Santa Barbara on a third occasion with additional charts. R.T. 841:5-7. She said "she thought that the testing was fraudulent." R.T. 841:11-12. Again, she signed the charts. R.T. 841:8-10.

LeChabrier described her responsibilities "as being there to countersign for the physician's assistant." R.T. 842:1-4. She admitted she had never been to the Richmond clinic or treated any patients there or at any clinic in Los Angeles relating to Petrosyan. R.T. 841:13-25. She had never spoken with anyone at the Richmond clinic. R.T. 842:5-12. She said she was paid $8,000 a month, and that she received payment by withdrawing funds from the Bank of America account. R.T. 842:16-25.

ECF No. 974 at 8-13.

### C. Handwriting Expert

On June 29, 2011, the day after the government rested its case, LeChabrier's trial counsel informed the trial court that he intended to call a handwriting expert as a witness. ECF No. 593 at 4-5. Counsel stated, however, that the expert would not be available to testify until the following Tuesday. *Id.* Counsel provided the court with a document that included the expert's examination of several signatures purportedly made by LeChabrier, which were contained in several of the government's exhibits.[4] *Id.* at 5-6. That examination concluded that LeChabrier "did not write the majority of her signatures in question" and "did not write any of the questioned hand printings."

---

[4] Those exhibits were: (1) the Medicare enrollment application for the Richmond clinic (Exhibit 401.1); (2) an EDI enrollment form and ERA enrollment form for the Richmond clinic (Exhibit 402); (3) the electronic funds transfer agreement (Exhibit 403); (4) the form submitted to Medicare terminating the Richmond provider number (Exhibit 404); (5) the EDI enrollment form for the Burbank clinic (Exhibit 414); and (6) the Medicare enrollment application for the Burbank clinic (Exhibit 414.1). The expert's report questioned some, but not all, of the signatures on these documents. ECF No. 975-9.

1    Trial counsel explained why he was not prepared to call the handwriting expert at that

2    time. *Id.* at 5-7.  When the judge questioned why counsel had not investigated the authenticity of

3    the signatures on the government's exhibits "first thing," counsel explained, "Well, it wasn't the

4    first thing I did, Judge, because Dr. Lana LeChabrier told me that Max gave her a bunch of

5    documents and had her sign them."  *Id.* at 7.  He stated that he "didn't know that there was even

6    an inference that there was forgeries going on until a month or a few weeks before trial."  *Id.*

7    Counsel argued that "the logical inference that can be argued in front of the jury is that Max was

8    deceiving her, and that Petrosyan was deceiving her to the point that he was forging her name or

9    having her – causing her name to be forged on critical documents that she had no knowledge of,

10   that she gave no consent to, that she had no participation in."  *Id.* at 11.  The judge responded:

11
12
13

> And now it turns out documents which you had over two years,
> which would be the very basic thing that one would look to see,
> which is whether or not your client actually signed the documents,
> was never looked at.  This seems to be a classic case of lack of
> preparation on your part constituting an emergency now on my part.

14   *Id.* at 12.

15   The trial judge denied trial counsel's request for a trial continuance to obtain the

16   testimony of the handwriting expert.  The judge noted that the documents analyzed by the

17   handwriting expert had been available to the defense for over two years; that LeChabrier had

18   always demanded a speedy trial; that the trial had already lasted one month; that the exhibits

19   examined by the expert had been provided in discovery "long before this case started" and were

20   therefore "not something new or newly discovered;" that a delay would cause a disruption in the

21   court's calendar; that counsel's request for continuance was being made "at the eleventh hour;"

22   and that calling the handwriting expert would might prejudice the other defendants, who did not

23   have such a witness.  *Id.* at 19-22.  The judge concluded, "for all of the reasons that I've stated, I

24   find that good cause has not been presented to delay the trial to allow a handwriting analysis

25   individual to appear."  *Id.* at 22.

26   In his closing argument, trial counsel argued that LeChabrier's signature may have been

27   forged on some of the documents comprising the government's exhibits, especially on documents

28   related to the Burbank clinic.  ECF No. 594 at 52, 58.

8

1     After LeChabrier was convicted she replaced her trial counsel and filed a motion for new

2  trial. ECF No. 472, 492, 629.  New counsel argued, among other things, that LeChabrier's trial

3  counsel rendered ineffective assistance in failing to retain a handwriting expert prior to trial.  ECF

4  No. 629.  The trial court denied the motion for new trial, reasoning as follows:

> Ms. Daly (LeChabrier's counsel) indicates that even the Court thought that Mr. Karowsky failed to live up to the standard of calling an expert.  Understanding that this was looking at something that was not specific to that case, it was in the general context of when people should be looking at bringing in certain types of experts.  And as Mr. Ferrari (the prosecutor) was very good about discussing, if you're going along with your client all along listening to what they're saying and she's admitted to doing this – yes, you did.  There was admissions that there were signatures that were there.  What would be the need for necessarily rushing out and getting that handwriting expert at the beginning?

> * * *

> There wasn't.  And there was enough evidence to show that she did sign some of the documents.  This was not a situation where everything was completely not in her name.  That she cannot deny that there was signatures, her signature, on some of these records.  And the fact that there was an expert or not to say that yes, it was would not have made any difference in the outcome of the case.  She was the signatory.  It's clear from that.

> If there was any issue with certain documents as not being sure of, that still doesn't go to the fact that the jury can still believe what it wanted to believe.  And the jury is not bound to take any testimony of any expert in any trial as the gospel.  We all know that we instruct the jury that you may take the testimony of an expert witness and give it great weight, give it some weight, or give it no weight at all.  Many times there will be competing experts.  One expert will say that the sun came up at 6:00.  One will say it came up at 9:00.  They're just different.

> So that is the purview of the jury to make that ultimate decision.  But there's been nothing in the course of the trial or the evidence that's been presented that says that your client did not sign any of those documents.

> And to go further with the *Strickland* analysis to say that Mr. Karowsky's representation did not rise to the standard of a prudent attorney I think is incorrect under the circumstances.

*Id.* at 7-9.

/////

/////

9

As noted above, LeChabrier claimed on appeal that the trial court abused its discretion in denying her motion to continue the trial to allow the handwriting expert to testify.  The United States Court of Appeals for the Ninth Circuit rejected this argument and denied her claim, reasoning as follows:

> In light of LeChabrier's admissions that she signed Medicare enrollment forms, opened a bank account to receive Medicare payments, and signed patient charts for the Richmond clinic even though she never examined a single patient, LeChabrier has not established that the verdict would have been different had she been granted a continuance to secure a handwriting expert's testimony. (citation omitted.)  Because the parties had been in trial for a month when LeChabrier moved for a continuance, the court properly considered the inconvenience to the court and the government in denying the request.

ECF No. 975-2 at 4.  LeChabrier also claimed on appeal that her trial counsel rendered ineffective assistance in failing to obtain a handwriting expert to testify at trial.  The Ninth Circuit denied that claim, reasoning:

> Here, LeChabrier's trial counsel's failure to pursue a handwriting expert was not deficient because she told counsel that she did, in fact, sign Medicare forms and there was no reason to question her statements.  *See Strickland*, 466 U.S. at 691 ("[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.").  Nor was this failure prejudicial to her defense. The record shows that LeChabrier admitted signing Medicare enrollment forms, opened a bank account to receive Medicare payments, and signed patient charts for one of the clinics without ever seeing a patient.  Thus, we conclude that LeChabrier has failed to demonstrate that she was deprived of the effective assistance of counsel.

*Id.* at 9.

## II.  Law Applicable to Motions Pursuant to 28 U.S.C. § 2255

A federal prisoner making a collateral attack against the validity of his or her conviction or sentence must do so by way of a motion to vacate, set aside or correct the sentence pursuant to 28 U.S.C. § 2255, filed in the court which imposed sentence.  *United States v. Monreal*, 301 F.3d 1127, 1130 (9th Cir. 2002).  Under § 2255, the federal sentencing court may grant relief if it concludes that a prisoner in custody was sentenced in violation of the Constitution or laws of the

1   United States.  *Davis v. United States*, 417 U.S. 333, 344-45 (1974); *United States v. Barron*, 172

2   F.3d 1153, 1157 (9th Cir. 1999).  To warrant relief, a petitioner must demonstrate the existence of

3   an error of constitutional magnitude which had a substantial and injurious effect or influence on

4   the guilty plea or the jury's verdict.  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *see also*

5   *United States v. Montalvo*, 331 F.3d 1052, 1058 (9th Cir. 2003) ("We hold now that *Brecht's*

6   harmless error standard applies to habeas cases under section 2255, just as it does to those under

7   section 2254.")  Relief is warranted only where a petitioner has shown "a fundamental defect

8   which inherently results in a complete miscarriage of justice."  *Davis*, 417 U.S. at 346.  *See also*

9   *United States v. Gianelli*, 543 F.3d 1178, 1184 (9th Cir. 2008).

10          Claims or arguments raised on appeal are not cognizable in a § 2255 motion.  *See United*

11   *States v. Redd*, 759 F.2d 699, 701 (9th Cir. 1985) (claims previously raised on appeal "cannot be

12   the basis of a § 2255 motion."); *United States v. Currie*, 589 F.2d 993, 995 (9th Cir. 1979)

13   ("[i]ssues disposed of on a previous direct appeal are not reviewable in a subsequent § 2255

14   proceeding.").  *See also Davis v. United States*, 417 U.S. 333, 342 (1974) (issues determined in a

15   previous appeal are not cognizable in a § 2255 motion absent an intervening change in the law).

16   Conversely, claims that could have been, but were not, raised on appeal are not cognizable in

17   § 2255 motions.  *United States v. Frady*, 456 U.S. 152, 168 (1982) (a collateral challenge is not a

18   substitute for an appeal); *Sunal v. Large*, 332 U.S. 174, 178 (1947) ("So far as convictions

19   obtained in the federal courts are concerned, the general rule is that the writ of habeas corpus will

20   not be allowed to do service for an appeal"); *Unites States v. Dunham*, 767 F.2d 1395, 1397 (9th

21   Cir. 1985) ("Section 2255 is not designed to provide criminal defendants repeated opportunities

22   to overturn their convictions on grounds which could have been raised on direct appeal").  Where

23   a defendant has procedurally defaulted a claim by failing to raise it on direct review, "the claim

24   may be raised in habeas only if the defendant can first demonstrate either "cause" and actual

25   "prejudice," or that he is "actually innocent."  *Bousley v. United States*, 523 U.S. 614, 622 (1998)

26   (citations omitted); *United States v. Braswell*, 501 F.3d 1147, 1149 (9th Cir. 2007) (same).

27   "Ineffective assistance of counsel constitutes 'cause' for failure to raise a challenge prior to

28   section 2255 collateral review."  *United States v. De la Fuente*, 8 F.3d 1333, 1337 (9th Cir. 1993).

1    Claims challenging the sufficiency of the evidence are not cognizable in § 2255 motions.

2    *See United States v. Berry*, 624 F.3d 1031, 1038 (9th Cir. 2010) (movant's "evidence-based"

3    claim that "called into doubt the overall weight of the evidence against him" was not cognizable

4    in § 2255 motion); *Barkan v. United States*, 362 F.2d 158, 160 (7th Cir. 1966) ("a collateral

5    proceeding under section 2255 cannot be utilized in lieu of an appeal and does not give persons

6    adjudged guilty of a crime the right to have a trial on the question of the sufficiency of the

7    evidence or errors of law which should have been raised in a timely appeal"); *United States v.*

8    *Collins*, No. C 97-1854 SI, 1999 WL 179809 (N.D. Cal. Mar. 25, 1999) (insufficiency of the

9    evidence is not a cognizable attack under section 2255).

10   **III.  Movant's Claims**

11       **A.  Due Process**

12       LeChabrier raises numerous due process claims related to the pre-trial, trial, and post-trial

13   proceedings.  The court will analyze these claims in turn below.

14           **1.  Alleged Due Process Violations "Pre-trial"**

15               **a.  Trial Venue**

16       LeChabrier claims that although she was imprisoned and tried in Sacramento, one of the

17   counts of which she was convicted stemmed from activity in a different jurisdiction.  She alleges

18   that the government "changed jurisdiction to obtain a more favorable court."  ECF No. 928 at

19   7A.[5]  This claim was waived by LeChabrier's failure to raise the issue before proceeding to trial.

20   *Rodd v. United States*, 165 F.2d 54, 55 (9th Cir. 1947) ("Appellant, however, waived this defect

21   by going to trial on the merits without raising any question of venue").  In any event, there is no

22   evidence before the court that the government selected the jurisdiction of LeChabrier's trial to

23   obtain more favorable treatment.  Accordingly, the claim must be denied.

24               **b.  Waiver of Rights**

25       LeChabrier alleges that her appellate counsel told her she had "signed a piece of paper

26   waiving all my rights giving them over to Joseph Wiseman," including her right to a speedy trial.

27   

28   _____
         [5]  Page number citations such as this one are to the page numbers placed by LeChabrier on
     her § 2255 motion and not to page numbers reflected on the court's CM/ECF system.

1 She states that at her arraignment, Mr. Wiseman "stuck a piece of paper under my nose, and said

2 'sign here,' and 'trust me.'" LeChabrier argues that "if this be the piece of paper waiving my

3 rights, not only was this not disclosed, but I signed under duress . . . ." ECF No. 918 at 2A. This

4 claim is captioned, "Waiver fraudulently obtained." *Id.* at 7A.

5       This claim is difficult to decipher but is ultimately vague and conclusory, and is

6 unsupported by any concrete facts, citation to the record, or documentary evidence. Accordingly,

7 it must be denied. *See Jones v. Gomez*, 66 F.3d 199, 204 (9th Cir. 1995) (quoting *James v. Borg*,

8 24 F.3d 20, 26 (9th Cir. 1994)) ("It is well-settled that '[c]onclusory allegations which are not

9 supported by a statement of specific facts do not warrant habeas relief.'"). In addition, there is no

10 evidence before the court that LeChabrier waived any of her constitutional rights under duress.

11 Accordingly, this claim must be denied.

12              **c.  Pretrial Hearing**

13       LeChabrier states that she was not informed she had the option of a "pre-trial hearing."

14 According to LeChabrier, she would have wanted such a hearing "had [she] been aware of this

15 option." ECF No. 928 at 7A. This claim is also vague and conclusory and should be denied on

16 that basis. *Jones*, 66 F.3d at 204.

17       To the extent LeChabrier is claiming she had the right to a preliminary hearing after the

18 indictment was filed, she is mistaken. *See Austin v. United States*, 408 F.2d 808, 810 (9th Cir.

19 1969) ("[t]he return of an indictment establishes probable cause, and eliminates the need for a

20 preliminary examination"). Finally, because LeChabrier could have raised this claim on appeal

21 but did not, the claim is not cognizable in this § 2255 motion. *Braswell*, 501 F.3d at 1149.

22              **d.  Failure to Conduct Investigation or to Communicate**

23       LeChabrier claims that her "arraignment attorney" (presumably attorney Wiseman) and

24 "subsequently appointed trial attorney" (presumably attorney Karowsky) failed to "investigate,

25 provide discovery or communicate" with her, leaving her "in a vacuum." ECF No. 928 at 7A.

26 LeChabrier specifically complains that, although she repeatedly asked "to see transcripts and

27 documents, including an indictment and the charges against me," she did not see the indictment

28 until her appellate attorney showed it to her a year after her trial. She states, "had I received this

13

1    indictment before trial, I would have learned of the fundamental error at the base of the

2    government's case, to wit: my credentials had been used without my knowledge or consent to

3    enroll me as a Medicare Provider." *Id.*   The court will construe these allegations as a claim of

4    ineffective assistance of counsel.

5            The applicable legal standards for a claim of ineffective assistance of counsel are set forth

6    in *Strickland v. Washington*, 466 U.S. 668 (1984).  To succeed on a *Strickland* claim, a defendant

7    must show that (1) his counsel's performance was deficient and that (2) the "deficient

8    performance prejudiced the defense." *Id.* at 687.  Counsel is constitutionally deficient if his or

9    her representation "fell below an objective standard of reasonableness" such that it was outside

10   "the range of competence demanded of attorneys in criminal cases." *Id.* at 687–88 (internal

11   quotation marks omitted).  "Counsel's errors must be 'so serious as to deprive the defendant of a

12   fair trial, a trial whose result is reliable.'" *Richter*, 562 U.S. at 114 (quoting *Strickland*, 466 U.S.

13   at 687).

14           A reviewing court is required to make every effort "to eliminate the distorting effects of

15   hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the

16   conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 669.  Reviewing courts

17   must also "indulge a strong presumption that counsel's conduct falls within the wide range of

18   reasonable professional assistance." *Strickland*, 466 U.S. at 689.  This presumption of

19   reasonableness means that the court must "give the attorneys the benefit of the doubt," and must

20   also "affirmatively entertain the range of possible reasons [defense] counsel may have had for

21   proceeding as they did." *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011) (internal quotation marks

22   and alterations omitted).

23           Prejudice is found where "there is a reasonable probability that, but for counsel's

24   unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466

25   U.S. at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the

26   outcome." *Id.*  "The likelihood of a different result must be substantial, not just conceivable."

27   *Richter*, 562 U.S. at 189.  A reviewing court "need not first determine whether counsel's

28   performance was deficient before examining the prejudice suffered by the defendant as a result of

14

1  the alleged deficiencies . . . .  If it is easier to dispose of an ineffectiveness claim on the ground of

2  lack of sufficient prejudice . . . that course should be followed."  *Strickland*, 466 U.S. at 697.

3       With regard to LeChabrier's allegations that she did not see a copy of the indictment prior

4  to trial, the record reflects the following facts.  As set forth above, at the arraignment on the

5  September 17, 2008 indictment, attorney Wiseman informed the trial court that LeChabrier had

6  received a copy of the indictment and had reviewed the charge with him.  LeChabrier did not

7  object to these statements.

8       On April 13, 2010, based on a stipulation of the parties and at LeChabrier's request, the

9  district judge appointed attorney Jan Karowsky to represent LeChabrier and attorney Wiseman

10  was relieved as counsel of record.  The grand jury subsequently returned a Superseding

11  Indictment in which LeChabrier and twelve co-defendants were charged with one count of

12  conspiracy to commit health care fraud and LeChabrier was charged with three individual counts

13  of health care fraud.  There is no reflection in the record that LeChabrier was arraigned on the

14  Superseding Indictment.  However, the government has provided a declaration signed under

15  penalty of perjury by attorney Karowsky, in which Karowsky declares that he met with

16  LeChabrier on June 9, 2010, and "provided her with a copy of the superseding indictment and

17  reviewed it with her."  ECF No. 975-16 at 4-5.  Karowsky also declares that he gave LeChabrier

18  "the new discovery I had received; and reviewed the status of our investigation."  *Id.*

19       Based on the evidence of record, LeChabrier's claim of ineffective assistance of counsel

20  must be denied.  The record demonstrates that LeChabrier reviewed the 2008 indictment with

21  attorney Wiseman and reviewed the 2012 superseding indictment with attorney Karowsky.

22  Accordingly, her allegation that she did not see what she was being charged with before trial

23  lacks a factual basis.  Even assuming *arguendo* that Wiseman and Karowsky rendered deficient

24  performance in failing to show LeChabrier the indictment and/or the superseding indictment prior

25  to trial, there is no evidence of any prejudice.  LeChabrier was represented by counsel during trial

26  and there is no indication she was confused about the charges against her, did not understand

27  what she was being charged with, or was unable to present a defense to those charges.

28  /////

LeChabrier has failed to demonstrate either deficient performance or prejudice with respect to this claim. Accordingly, it must be denied. [6]

/////

---

[6] Although LeChabrier does not raise this claim, the Sixth Amendment guarantees a criminal defendant the fundamental right to be clearly informed of the nature and cause of the charges against him/her in order to permit adequate preparation of a defense. *Cole v. State of Ark.*, 333 U.S. 196, 201 (1948). To that end, Rule 10(a) of the Federal Rules of Criminal Procedure provides, in pertinent part:

> An arraignment must be conducted in open court and must consist of: (1) ensuring that the defendant has a copy of the indictment or information; (2) reading the indictment or information to the defendant or stating to the defendant the substance of the charge; and then (3) asking the defendant to plead to the indictment or information. Fed. R. Crim. P. 10(a).

However, the United States Supreme Court has held that lack of a formal arraignment does not deprive a defendant of any substantial right so long as the defendant had sufficient notice of the accusation and an adequate opportunity to defend herself. *Garland v. Washington*, 232 U.S. 642, 645 (1914). Courts of Appeals which have considered this issue have likewise found that a technical failure to comply with Rule 10 does not affect a substantial right as long as the accused has sufficient notice of the charges, had adequate opportunity to prepare a defense, and the technical lack of formal arraignment did not prejudice the defendant. *See e.g.*, *United States v. Romero*, 640 F.2d 1014, 1015 (9th Cir. 1981) (finding that defendant was not subject to any prejudice as a result of the district court's failure to read the indictment to him at arraignment because defendant had received a copy of the indictment and had an opportunity to read it before making his plea); *United States v. Mancias*, 350 F.3d 800, 807 (8th Cir. 2003) (finding that the "absence of formal arraignment is of little consequence" so long as "the accused "had sufficient notice of the accusation and an adequate opportunity to defend himself"") (quoting *United States v. Reynolds*, 781 F.2d 135, 136 n.2 (8th Cir.1986)); *United States v. Cook*, 972 F.2d 218, 222 (8th Cir. 1992) ("an arraignment is not required where the defendant has had sufficient notice of the accusation and an adequate opportunity to defend himself at trial") (citing *Garland*, 232 U.S. 642); *United States v. Coffman*, 567 F.2d 960, 961 (10th Cir. 1977) (finding that defendant was not prejudiced by the failure to be formally arraigned when he had been given a copy of the indictment and when the failure to arraign was inadvertent); *United States v. Rogers*, 469 F.2d 1317, 1318 (5th Cir.1972) (finding that defendant suffered no prejudice when the court failed to read the indictment or provide a copy to defendant at arraignment because he was represented by counsel and did not allege that he was ignorant of the offense charged); *United States v. Clark*, 407 F.2d 1336, 1337 (4th Cir.1969) (finding no merit in defendant's challenge for failure to receive a copy of the indictment when defense counsel had been given a copy of the indictment and defendant had informed the court that he had read the indictment and understood the charges against him). As set forth above, it appears that LeChabrier reviewed both the initial and the superseding indictments with her counsel and was able to present an adequate defense at trial. Accordingly, even though LeChabrier was apparently not arraigned on the superseding indictment, her Sixth Amendment right to notice was not violated under the circumstances of this case.

1     LeChabrier's other allegations contained in her description of this claim fail to

2  demonstrate ineffective assistance of counsel.  Her conclusory allegations that counsel failed to

3  "investigate, provide discovery or communicate" with her, leaving her "in a vacuum," are clearly

4  insufficient and fail to demonstrate either deficient performance or prejudice.  *See Jones*, 66 F.3d

5  at 205 ("conclusory suggestions" and "bald assertions" fall short of stating an ineffective

6  assistance of counsel claim and do not entitle the petitioner to an evidentiary hearing); *Villafuerte*

7  *v. Stewart*, 111 F.3d 616, 632 (9th Cir. 1997) (petitioner's ineffective assistance claim denied

8  where he presented no evidence concerning what counsel would have found had he investigated

9  further, or what lengthier preparation would have accomplished); *Hendricks v. Calderon*, 70 F.3d

10  1032, 1042 (9th Cir. 1995) ("Absent an account of what beneficial evidence investigation into

11  any of these issues would have turned up, Hendricks cannot meet the prejudice prong of the

12  *Strickland* test).

13     For the foregoing reasons, LeChabrier is not entitled to habeas relief on these claims of

14  ineffective assistance of counsel.

15                         **e.  Pre-Trial Detention**

16     LeChabrier claims that she was wrongfully imprisoned after being apprehended at the

17  Canadian border, leaving her unable to fully prepare for trial and causing "enormous prejudice" to

18  her case.  She offers an excuse for her presence in the State of Washington and her attempt to

19  enter Canada and claims that the trial judge improperly used the incident "to harshly enhance the

20  terms of my sentence."  ECF No. 928 at 7A, 2B.  She also states that a "competent attorney"

21  would have investigated her reasons for being in Washington.

22     LeChabrier has failed to demonstrate that this claim is cognizable in a § 2255 motion.  *See*

23  *Kett v. United States*, 722 F.2d 687, 690 (11th Cir. 1984) ("claims of excessive bail are not

24  cognizable in a section 2255 action.").  In addition, LeChabrier did not challenge her pretrial

25  detention in a petition to the District Court pursuant to 18 U.S.C. § 3145(b) ("If a person is

26  ordered detained by a magistrate judge, or by a person other than a judge of a court having

27  original jurisdiction over the offense and other than a Federal appellate court, the person may file,

28  with the court having original jurisdiction over the offense, a motion for revocation or amendment

17

1   of the order").  The Third Circuit has explained that "[c]hallenging federal pretrial detention via a

2   § 2241 petition has been both harshly criticized, *Fassler v. United States*, 858 F.2d 1016, 1018–

3   19 (5th Cir. 1988) (per curiam), and held to be inappropriate." *United States v. Pipito*, 861 F.2d

4   1006, 1009 (7th Cir. 1987)." *United States v. Roberts*, 463 F. App'x 72, 74 (3d Cir. 2012).

5           Even if this claim were cognizable in a § 2255 motion, LeChabrier has not shown that she

6   is entitled to relief.  With respect to the reason for LeChabrier's pretrial detention, ¶ 40 of the

7   presentence report explains:

8           . . . on April 27, 2009, while on pretrial release, LeChabrier was
            arrested by the RCMP while attempting to enter into Canada.
9           According to an RCMP report, LeChabrier drove to the border
            crossing in a rental car and, at primary inspection, stated she was
10          not in possession of over $10,000.   During secondary inspection,
            she was found to have $274 in her pockets.  When asked if she had
11          any more money, she indicated she had about $200 in a black bag.
            Inspecting officers determined there was $55,000 in the bag.  Upon
12          inquiry, LeChabrier related she flew two days earlier (Saturday)
            from Santa Barbara to Seattle, Washington, for a job interview on
13          Tuesday morning (April 28, 2009).  She explained she was entering
            Canada to look at a bed and breakfast hotel called "Katie's Place"
14          that she was considering purchasing.   Subsequent investigation
            revealed there was no such establishment in the Greater Vancouver
15          (British Columbia, Canada) area.

16   Under these circumstances, LeChabrier has failed to show that she was wrongfully detained or

17   imprisoned for being a flight risk.  Accordingly, this claim must be denied.

18                          **f.  Substitution of Counsel**

19          LeChabrier claims that she was improperly denied the right to replace "a negligent

20   attorney of record."  ECF No. 928 at 7A.  The record shows otherwise.

21          More specifically, LeChabrier contends that appointed attorney Joseph Wiseman failed

22   and refused to communicate with her and refused her requests to "step aside graciously" so that

23   another attorney ("private attorney Shari Rusk") could take the case.  *Id.* at 2B.  LeChabrier

24   contends that if Rusk had "been able to take the case, the result would surely have been

25   different."  *Id.*  She also claims the trial judge refused to allow her to replace Weisman as her

26   counsel, telling her that Weisman was "doing a fine job."  *Id.*

27          As explained above, the record actually reflects that on April 13, 2010, pursuant to a

28   stipulation between LeChabrier, Weisman, and counsel Karowsky, the trial court ordered that

Karowsky be substituted as LeChabrier's attorney of record.  ECF No. 152.  Accordingly, LeChabrier's claim that the trial judge refused to allow her to replace attorney Weisman lacks a factual basis and must be denied.  Weisman's alleged failure to step aside earlier does not constitute a violation of federal law.  Finally, LeChabrier's assertions that she would have fared better with attorney Rusk are speculative and conclusory and do not establish that she suffered prejudice from her inability to substitute another attorney for Mr. Weisman earlier.

For the foregoing reasons, these claims should be denied.

### g. Speedy Trial

LeChabrier claims that she was denied the right to a speedy trial by the trial judge and by her appointed attorneys Wiseman and Karowsky.  ECF No. 928 at 2B, 7A.  She states that attorney Weisman told her he had "filed" and that attorney Karowsky "refused outright."  *Id.* at 2B.  She argues, "there is no doubt that this delay of trial (over 3 years after arrest) was a prosecutorial tactic to obtain a conviction they could not have obtained had my right to the speedy trial I called for from day one been respected."  *Id.*

On appeal, the U.S. Court of Appeals for the Ninth Circuit concluded that LeChabrier had waived any claim she may have had under the Speedy Trial Act by failing to move for dismissal prior to trial.  ECF No. 975-2 at 9-10. In light of this ruling by the Ninth Circuit, LeChabrier is not entitled to relief on any claim under the Speedy Trial Act.  In any event, LeChabrier's claim in this regard is also conclusory, confusing, and unsupported by citations to the record, and should be denied on that basis as well.  Finally, the court notes that attorney Karowsky filed a motion to sever LeChabrier's trial from the trial of her co-defendants on speedy trial grounds. ECF No. 230.

For all of these reasons, LeChabrier's claim based on the denial of her right to a speedy trial must be denied.

### h. Failure to Sever

LeChabrier claims that the trial judge improperly denied her pre-trial motion to sever her trial from that of her co-defendants, which "enabled prosecutors to obtain a conviction they could never have obtained had I stood alone, since the government suppressed evidence pertaining to

1    me while introducing at trial parallel evidence pertaining to codefendants and insinuating that the

2    evidence pertaining to me was similar (had it been, they would have introduced it!)."  ECF No.

3    928 at 7A, 2B.  This claim is waived due to LeChabrier's failure to raise it on appeal.

4                          **i.  Failure to Investigate Whether Movant's Signature was Forged**

5              LeChabrier claims that trial counsel Karowsky rendered ineffective assistance in failing to

6    investigate whether her signature on government exhibits was forged.  *Id.* at 7A, 2C.  The

7    underlying facts surrounding this claim are set forth above.  As noted, the Ninth Circuit

8    considered and denied LeChabrier's claim on appeal that her trial counsel rendered ineffective

9    assistance in failing to obtain a handwriting expert to testify about the authenticity of her

10   signatures on the government's exhibits.  LeChabrier may not raise this claim again in this § 2255

11   motion.  *Redd*, 759 F.2d at 701.

12                          **2.  Alleged Due Process Violations at Trial**

13                          **a.  Denial of Right to Call Witnesses**

14             LeChabrier claims that the trial court's denial of her request for a trial continuance to

15   allow her to obtain a handwriting expert witness violated her right "to call a witness in my

16   defense."  ECF No. 928 at 7A, 2D.  She states that because of the trial court's ruling "the jury

17   never learned that the ONE count of which I was convicted (Burbank) was based upon a

18   document enrolling me as a Medicare Provider that was completely and entirely forged."  *Id.* at

19   7D.  As set forth above, the Ninth Circuit affirmed the District Court's denial of LeChabrier's

20   motion for a trial continuance so that she could obtain a handwriting expert.  ECF No. 975-2 at 2-

21   3.  Accordingly, she is not entitled to relief on this claim.  *Redd*, 759 F.2d at 701.

22                          **b.  Response to Jury Note**

23             LeChabrier claims that her "juror rights" were violated when the trial judge denied the

24   jury's request to see the transcript of FBI Agent Jensen's trial testimony.  ECF No. 928 at 7A, 2D.

25   This claim could have been, but was not, raised on appeal and is therefore not cognizable in this

26   § 2255 motion.  *Frady*, 456 U.S. at 168.

27   /////

28   /////

20

### 3. <u>Alleged Due Process Violations Post-Trial</u>

#### a. <u>Abandonment of Case</u>

Le Chabrier claims that her trial counsel "abandoned the case" for the following reason:

> Mr. Karowsky dropped the case as soon as the verdict was in (actually, he was on his cell phone the second the jury went to deliberate regarding another trial he was conducting simultaneously). I stood unrepresented – the judge allowed him to bolt.

ECF No. 928 at 7E, 2D. This claim, too, is vague and conclusory and should be denied on that basis. *Jones,* 66 F.3d at 204; *James*, 24 F.3d at 26. LeChabrier has also failed to demonstrate that she suffered prejudice from the actions of her counsel, as alleged in this claim. Accordingly, she is not entitled to habeas relief.

#### b. <u>Failure to File Appeal</u>

LeChabrier claims that her appellate counsel failed to file an appeal "seeking overturn of a wrongful conviction." ECF No. 928 at 7B. She states that counsel filed a motion for new trial instead of filing an appeal. *Id.* at 2D. According to LeChabrier, after the motion for new trial was denied appellate counsel "refused to appeal even that ruling to Ninth Circuit." *Id.* LeChabrier also claims that the trial court's refusal to issue a certificate of appealability "on a plainly erroneous ground that involved actual misconduct . . . was an obstruction of due process" and violated her right to access the courts. *Id.*

The court record reflects that LeChabrier's trial counsel filed a motion for new trial on March 2, 2012. ECF No. 629. That motion was denied on April 5, 2012. ECF No. 653. On January 3, 2012, LeChabrier, proceeding without counsel, filed a § 2255 motion. ECF No. 562. That motion was denied on the basis that it was premature. ECF No. 638, 670. LeChabrier filed an appeal of that ruling and several requests for a certificate of appealability. ECF Nos. 652, 677, 678. Her requests for a certificate of appealability were denied by both the district court and the Ninth Circuit. ECF No. 684, 765. On June 4, 2012, before she was sentenced, LeChabrier, proceeding without counsel, filed a notice of appeal of her "conviction and sentencing" and requested a certificate of appealability. ECF No. 688. LeChabrier's appellate counsel filed an

/////

21

1    appeal on the same day LeChabrier was sentenced.  ECF No. 707.  The appeal did not include a

2    challenge to the trial court's denial of LeChabrier's motion for new trial.

3        The government provides a declaration signed under penalty of perjury by Kresta Daly,

4    LeChabrier's appellate counsel.  Therein, Ms. Daly states that she told LeChabrier it was in her

5    best interests to file a motion for new trial before filing an appeal and, if the motion was

6    unsuccessful, to then file an appeal.  ECF No. 975-17 at 3.  LeChabrier "understood and agreed

7    with this strategy."  *Id.*  When the motion for new trial proved unsuccessful, Daly filed an appeal,

8    as she had discussed with LeChabrier.  Before filing the appeal, she and LeChabrier "discussed

9    what she (LeChabrier) believed to be the basis for the appeal – the basis was essentially the same

10   as the basis for the motion for a new trial."  *Id.*  Ms. Daly further declares that she did not receive

11   any inquiries from LeChabrier about the status of her appeal.  *Id.* at 4.

12       The *Strickland* standards apply to appellate counsel as well as trial counsel.  *Smith v.*

13   *Murray*, 477 U.S. 527, 535-36 (1986); *Miller v. Keeney*, 882 F.2d 1428, 1433 (9th Cir. 1989).  In

14   order to establish prejudice in this context, petitioner must demonstrate that, but for counsel's

15   errors, she probably would have prevailed on appeal.  *Id.* at 1434 n.9.

16       Under the circumstances of this case, LeChabrier's claims regarding her appellate counsel

17   and the denial of her requests for a certificate of appealability should be denied.  LeChabrier's

18   appellate counsel did file an appeal.  Although appellate counsel did not specifically challenge the

19   trial court's denial of LeChabrier's motion for a new trial, the basis for her appellate arguments

20   "was essentially the same as the basis for the motion for a new trial."  ECF No. 975-17 at 3.

21   Appellate counsel's decision to file a motion for new trial, before filing an appeal on essentially

22   the same grounds, was well "within the range of competence demanded of attorneys in criminal

23   cases."  *McMann v. Richardson*, 397 U.S. 759, 771 (1970).  To the extent LeChabrier is claiming

24   her counsel should have raised additional claims in the appeal, her claim must be denied.  *See*

25   *Smith v. Robbins*, 528 U.S. 259, 288 (2000) ("appellate counsel who files a merits brief need not

26   (and should not) raise every nonfrivolous claim, but rather may select from among them in order

27   to maximize the likelihood of success on appeal"); *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir.

28   1985) ("Generally, only when ignored issues are clearly stronger than those presented, will the

1    presumption of effective assistance of counsel be overcome").  Indeed, the United States Supreme

2    Court has stated that "appellate counsel who files a merits brief need not (and should not) raise

3    every nonfrivolous claim, but rather may select from among them in order to maximize the

4    likelihood of success on appeal." *Robbins*, 528 U.S. at 288.

5         Nor is LeChabrier entitled to relief on her claim that her requests for a certificate of

6    appealability were improperly denied.  A certificate of appealability may issue under 28 U.S.C.

7    § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional

8    right."  28 U.S.C. § 2253(c)(2).  LeChabrier has not shown that she was entitled to a certificate of

9    appealability when she appealed the denial of her premature § 2255 motion and/or her

10   "conviction and sentence."  She has also failed to show that she was unable to access the courts.

11   On the contrary, LeChabrier is now proceeding with a § 2255 motion and she was able to

12   proceed, through counsel, with an appeal of her conviction.

13        For the foregoing reasons, LeChabrier is not entitled to relief on these claims.

14                           **c. <u>Harsh Sentence</u>**

15        LeChabrier claims that the trial court's imposition of a "harsh sentencing enhancement

16   based upon unfounded accusations" violated her right to due process.  ECF No. 928 at 7B.  She

17   asserts that the jury only convicted her of one count of health care fraud but at the sentencing

18   proceedings the judge "added his own accusations – mostly unfounded accusations and

19   universally unfounded, and not raised at trial – to attempt to justify a harsh enhancement of

20   sentencing (from ONE count to 17 . . . )." *Id.*  She contends that the trial judge added "16 counts

21   of his own to the ONE count of which I was convicted." *Id.*  She also argues that "this is

22   important not only for the enhancement itself, but for the illustration of the personal hostility of

23   this judge towards me that should have been cause for recusal long before sentencing; certainly, it

24   is a strong reason for venue change now." *Id.*  In support of this claim, LeChabrier has attached a

25   copy of her judgment.  That document reflects, accurately, that she was found guilty on count 1 of

26   the Superseding Indictment for conspiracy to commit health care fraud and on count 17 for health

27   care fraud.  ECF No. 928, Ex. 3.

28   /////

Neither the attached exhibit nor LeChabrier's allegations establish that her right to due process was violated by the trial judge's imposition of a harsh sentence based on "unfounded accusations." The judgment accurately reflects the counts on which LeChabrier was convicted, and there is no evidence LeChabrier was improperly sentenced. The trial judge did not "add" counts to those for which she was convicted. There is also no evidence of any personal bias or hostility against LeChabrier by the trial judge that resulted in an unduly harsh sentence. Further, as noted by the government, any challenge to the calculation of LeChabrier's sentencing guidelines is waived by her failure to raise it on appeal. Accordingly, LeChabrier is not entitled to relief on these claims.

**B. Prosecutorial Misconduct**

In her next ground for relief, LeChabrier claims that she was subjected to "malicious prosecution" by the prosecutor. ECF No. 928 at 8A. She presents a litany of allegations in support of this claim. They are conclusory and somewhat rambling, but appear to be the following: (1) there was a "fundamental error" in the government's case because her credentials were used without her knowledge to enroll her as a Medicare Provider; (2) the prosecutor told the jury she was hired as a primary care physician but suppressed evidence that another physician had been hired to fulfill that role, while she was only hired as the Medical Director and had "no patient care at all;" (3) the prosecutor knew she was not guilty of Medicare fraud but suppressed evidence from FBI case agents (tapes of interviews with LeChabrier) that proved her innocence; (4) the prosecutor did not call experienced FBI case agents as witnesses, but chose instead to call an inexperienced FBI agent who had no knowledge of Medicare and who gave perjured testimony; (5) the prosecutor suppressed Medicare forms "pertaining to MPN numbers in my name," while presenting at trial Medicare forms signed by her codefendants, and falsely told the jury that similar forms existed for her; (6) the government "slipped" Medicare Provider enrollment documents to the jury even though the prosecutor knew those documents were forged; (7) medical charts that prosecutors said were LeChabrier's charts from the Richmond clinic (even though they were another physician's charts) were suppressed, while charts pertaining to her co-defendants were presented, with "prosecutors telling the jury that similar charts existed for me

24

pertaining to the Richmond clinic;" (8) prosecutors did not produce medical charts or Medicare forms from the Burbank clinic at trial, but produced "the forged Medicare Provider enrollment application," "so presumably documents pertaining to Burbank were <u>suppressed</u>" because it was clear she had not signed them; (9) the government suppressed a "critical banking document" that fraudulently used her credentials to commit fraud; (10) the government suppressed signage outside the Richmond clinic which would have reflected that she did not perform medical services on site; (11) the government introduced  evidence, such as checks for rent and utilities paid at various clinics, which "insinuated" that she had rented office space for these clinics when she had not; (12) the prosecutors made unlawful reference to the nationalities of various physicians, which "impugned [her] along with codefendants as being foreign doctors, when in fact she had trained and taught at American institutions;" (13) prosecutors suppressed her employment contract and falsely asserted at trial that she was a partner in the clinics and was paid "a cut" of "the take," even though they knew she was just an employee; (14) prosecutors delayed trial for three years as a tactic "to obtain a conviction they could otherwise not achieved" and suppressed "exonerating evidence whilst introducing evidence pertaining to codefendants insinuating similar evidence existed for me;" and (15) the prosecutor attempted "character assassination" by running TV news releases that "demonized" her.  In summary, LeChabrier claims she was the victim of "malicious prosecution" because the government used knowingly false evidence to convict her ("forgery, suppression and misrepresentation of evidence in a joint trial where I had not been told of charges nor seen an indictment prior to trial").

LeChabrier's claims of prosecutorial misconduct were not raised on appeal.  Accordingly, they are not cognizable in the instant motion.  As noted above, a collateral challenge is not a substitute for an appeal.  *Frady*, 456 U.S. at 168.  "Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either "cause" and actual "prejudice," or that he is "actually innocent."  *Bousley*, 523 U.S. at 622 (citations omitted).  LeChabrier has not demonstrated cause or prejudice or that she is actually innocent of the charges against her.

/////

1    Even if these claims had been properly presented on appeal, they lack merit and must be

2    denied.  A criminal defendant's due process rights are violated when a prosecutor's misconduct

3    renders a trial fundamentally unfair.  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  Claims of

4    prosecutorial misconduct are reviewed "'on the merits, examining the entire proceedings to

5    determine whether the prosecutor's [actions] so infected the trial with unfairness as to make the

6    resulting conviction a denial of due process.'"  *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir.

7    1995) (citation omitted).  *See also Greer v. Miller*, 483 U.S. 756, 765 (1987); *Donnelly v.

8    DeChristoforo*, 416 U.S. 637, 643 (1974); *Towery v. Schriro*, 641 F.3d 300, 306 (9th Cir. 2010).

9    When prosecutorial conduct is called in question, the issue is whether, considered in the context

10   of the entire trial, that conduct appears likely to have affected the jury's discharge of its duty to

11   judge the evidence fairly.  *United States v. Young*, 470 U.S. 1, 11 (1985).

12   Relief on such claims is limited to cases in which the petitioner can establish that

13   prosecutorial misconduct resulted in actual prejudice.  *Darden*, 477 U.S. at 181-83.  *See also

14   Towery*, 641 F.3d at 307 ("When a state court has found a constitutional error to be harmless

15   beyond a reasonable doubt, a federal court may not grant habeas relief unless the state court's

16   determination is objectively unreasonable").  Prosecutorial misconduct violates due process when

17   it has a substantial and injurious effect or influence in determining the jury's verdict.  *See Ortiz-

18   Sandoval v. Gomez*, 81 F.3d 891, 899 (9th Cir. 1996).

19   A violation of a defendant's rights occurs if the government knowingly uses false

20   evidence in obtaining a conviction.  *Giglio v. United States*, 405 U.S. 150, 153-54 (1971); *Napue

21   v. Illinois*, 360 U.S. 264, 269 (1959).  There are several components to establishing a claim for

22   relief based on the prosecutor's introduction of perjured testimony at trial.  First, the petitioner

23   must establish that the testimony was false.  *United States v. Polizzi*, 801 F.2d 1543, 1549-50 (9th

24   Cir. 1986).  Second, the petitioner must demonstrate that the prosecution knowingly used the

25   perjured testimony.  *Id.*  Finally, the petitioner must show that the false testimony was material.

26   *United States v. Juno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003).  False evidence is material "if

27   there is any reasonable likelihood that the false [evidence] could have affected the judgment of

28   the jury."  *Hein v. Sullivan*, 601 F.3d 897, 908 (9th Cir. 2010) (quoting *United States v. Bagley*,

26

1  473 U.S. 667, 678 (1985)).  Mere speculation regarding these factors is insufficient to meet

2  petitioner's burden.  *United States v. Aichele*, 941 F.2d 761, 766 (9th Cir. 1991).

3      LeChabrier has failed to demonstrate that the prosecutor knowingly used false evidence to

4  convict her or that she was the victim of malicious prosecution.  Nor is there evidence that the

5  prosecutor suppressed exculpatory evidence, impugned anyone's nationality, attempted

6  "character assassination," or delayed trial as a tactic to obtain an unlawful conviction.  As noted

7  by respondent, LeChabrier's allegations mainly concern the prosecutor's decision to offer certain

8  documents into evidence and not to offer others.  To the extent LeChabrier believed additional

9  documents should have been admitted at trial, she had the opportunity to admit them herself.  She

10  also had the opportunity to challenge the admissibility of the government's evidence.  To the

11  extent that LeChabrier is claiming the evidence introduced by the prosecution is insufficient to

12  support her convictions, the claim is not cognizable in this § 2255 motion.  *Berry*, 624 F.3d at

13  1038; *Barkan*, 362 F.2d at 160.

14      The Ninth Circuit determined that LeChabrier admitted "she signed Medicare enrollment

15  forms, opened a bank account to receive Medicare payments, and signed patient charts for the

16  Richmond clinic even though she never examined a single patient."  ECF No. 975-2 at 4.  Given

17  these admissions, LeChabrier has failed to demonstrate that the prosecutor's decisions with regard

18  to the presentation of the government's case, including which documents to offer into evidence

19  and which to withhold, resulted in prejudice.

20      For all of these reasons, LeChabrier is not entitled to relief on her claims of prosecutorial

21  misconduct.

22  **C.  Judicial Misconduct**

23      In a claim entitled "Judicial misconduct," LeChabrier claims that the trial judge violated

24  her constitutional rights through numerous errors.  First, she claims the judge improperly denied

25  her request to replace attorney Wiseman as her attorney of record.  ECF No. 928 at 8C.  She

26  repeats her allegations that Mr. Wiseman failed to effectively defend this case and that he refused

27  to allow attorney Rusk to take over for him.  *Id.*  She claims, "had I been allowed to replace Mr.

28  Wiseman, the prosecution would never moved forward."  *Id.*  She also claims that the trial judge:

27

1  (1) told her she was "causing us trouble" and that he was going to "punish [her] with a

2  particularly nasty trial;" (2) refused to allow attorney Karowsky to obtain handwriting analysis

3  testimony and refused to grant a mistrial on this basis; (3) refused the jurors' request to "see

4  testimony of the one government witness against me;" (4) refused jurors' request for

5  "clarification of which Exhibit pertained to which defendant;" and (5) criticized Karowsky's

6  performance.  *Id.*

7       LeChabrier argues the trial judge's bias against her should have caused him to recuse

8  himself.  *Id.*  She also alleges the judge sentenced her harshly out of revenge for causing

9  "trouble."  *Id.*  She states the trial judge:

10           Held me accountable for the entirety of the scam that had been
             going on for several years before I ever applied for the Medical
11           Director job, adding 16 counts of his own to the ONE HC count the
             jury convicted me of, vindictively enhancing my sentence and
12           instituting onerous and unfair restitution.

13  *Id.*  LeChabrier also claims that the trial judge improperly refused to "issue a COA" and "had a

14  magistrate render this decision on my 2255 in an act so egregious as to constitute an obstruction

15  of due process aimed to block higher court examination of his decisions in this case."  *Id.*  She

16  summarizes, "I contend that the extreme obstruction of due process to which I was subjected

17  constitutes judicial misconduct, a malicious disregard of my right to fairness."  *Id.*

18       LeChabrier's claims of judicial misconduct could have been, but were not raised on

19  appeal.  Accordingly, they are not cognizable in this § 2255 motion.  *Frady*, 456 U.S. at 168.

20  Even if they were cognizable, they lack merit.

21       A number of LeChabrier's allegations lack a factual basis.  There is no evidence the trial

22  judge refused to allow LeChabrier to replace attorney Wiseman; on the contrary, Wiseman was

23  replaced by attorney Karowsky.  LeChabrier's allegations regarding Wiseman's failure to allow

24  attorney Rusk to take over for him earlier are unconnected with any actions by the trial judge.

25  Similarly, LeChabrier's claims that the trial judge sentenced her based on "revenge," or for

26  crimes of which she was not convicted, or "added" counts to the verdict, are not supported by the

27  record.

28  /////

1    LeChabrier also claims that some of the trial judge's rulings constitute judicial bias.  The

2    United States Supreme Court has observed that "judicial rulings alone almost never constitute a

3    valid basis for a bias or partiality motion."  *Liteky v. United States*, 510 U.S. 540, 555 (1994).

4    Thus, allegations concerning errors in the trial judge's rulings with regard to the handwriting

5    expert, the motion for new trial, and LeChabrier's prematurely filed § 2255 motion, without

6    more, are not sufficient to support a claim of judicial bias.

7         LeChabrier also challenges some of the judge's remarks from the bench.  However,

8    "opinions formed by the judge on the basis of facts introduced or events occurring in the course

9    of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality

10   motion unless they display a deep-seated favoritism or antagonism that would make fair judgment

11   impossible."  *Id.*  Similarly, "judicial remarks during the course of a trial that are critical or

12   disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a

13   bias or partiality challenge."  *Id.*  A trial judge's "ordinary efforts at courtroom administration  . . .

14   remain immune."  *Id.*  LeChabrier has failed to demonstrate that the trial judge's actions or

15   remarks were improper in any way or constituted judicial bias.  There is also no evidence the

16   judge had a "deep-seated favoritism or antagonism that would make fair judgment impossible."

17   Accordingly, LeChabrier is not entitled to relief on her claims of judicial bias.

18        **D.  Ineffective Assistance of Counsel/ Attorney Karowsky**

19        In addition to the claims of ineffective assistance of counsel which have been addressed

20   above, LeChabrier includes additional allegations about the performance of attorney Karowsky.

21   The court addresses these claims below.

22        LeChabrier claims that attorney Karowsky "neglected" her case prior to trial, was

23   "excoriated by the judge over several pages of trial transcript as the worst preparation for trial that

24   he had ever seen (to which Mr. Karowsky replied, and I quote: 'mea culpa.');" conducted no

25   investigation, including any investigation into possible forgery; conducted "no discovery;" failed

26   to tell LeChabrier that she was "accused of being a Medicare Provider;" conducted a "dismal

27   representation at trial, when he went from paying scant attention to proceedings to a completely

28   fabricated closing argument;" made no opening statement or defense;" refused to call defense

1  witnesses; conducted incompetent cross-examination of government witnesses; missed the

2  significance of certain trial testimony; suppressed exculpatory information, failed to introduce

3  exculpatory evidence that she was not involved in the conspiracy; failed to cross-examine FBI

4  agent Jensen to elicit the fact that he gave perjured testimony; and failed to call two other FBI

5  agents as witnesses.  ECF No. 928 at 9A.

6          LeChabrier also claims that attorney Karowsky made false and inaccurate statements

7  during closing argument about her knowledge of and involvement with the various clinics and the

8  fraudulent scheme, and that he "lacked sufficient knowledge of the facts of this case to have

9  presented an accurate account."  *Id.* at 9B.  She claims Karowsky "confabulated, essentially

10 telling lies;" made statements which implied she signed Medicare forms, "when she did not;" and

11 failed to tell the jury that she knew "nothing" about the Burbank clinic.  *Id.*  She argues that

12 "given jurors skepticism about my involvement I don't believe that the government could have

13 obtained a conviction but for Mr. Karowsky's colossal mistakes in closing argument."  *Id.*

14 LeChabrier summarizes:

15          Mr. Karowsky's failure to prepare for trial, excoriated by the judge
           over several pages of trial transcript, was trumped by a performance
16         at trial that deserves to be included in law school case studies as an
           example of just how <u>bad</u> representation can be: But for Mr.
17         Karowsky's representation, I could not have been convicted in this
           case . . . hence, the issue is material.
18

19 *Id.*

20          The government has provided the declaration of attorney Karowsky, signed under penalty

21 of perjury.  ECF No. 975-16.  Therein, Karowsky explains the actions he took in connection with

22 his representation of LeChabrier and the reasons he failed to take certain actions.  With regard to

23 LeChabrier's vague claim that Karowsky "neglected" the case prior to trial, Karowsky's

24 declaration reflects that he met with attorney Wiseman to discuss the case and Wiseman's

25 suggestions on how to approach it; met with LeChabrier on at least 15 occasions prior to trial to

26 review Wiseman's file and answer "all of the questions posed by [LeChabrier] in the many letters

27 she had written to me;" retained an investigator who also met with LeChabrier prior to trial;

28 reviewed discovery; discussed the charges with LeChabrier and showed her the indictment;

1   showed LeChabrier Wiseman's entire trial file; conducted investigation with regard to at least one

2   potential witness; subpoenaed and reviewed records and emails sent to and from LeChabrier;

3   requested discovery from the government; filed a motion to withdraw LeChabrier's proposed

4   competency evaluation; filed a motion to sever; filed an appeal of the denial of the motion to

5   sever; met with the prosecutor (with the agreement of LeChabrier) in an effort to persuade him to

6   dismiss the charges against LeChabrier; and searched for emails that LeChabrier told him would

7   exonerate her.  *Id.*  In light of these actions undertaken by Karowsky on her behalf,  LeChabrier

8   has failed to demonstrate that Karowsky was deficient in "neglecting" her case prior to trial.

9   Certainly, LeChabrier has failed to show that attorney Karowsky "made errors so serious that

10   counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment."

11   *Richter*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 687).

12       With regard to Karowsky's trial performance, LeChabrier claims, in essence, that

13   Karowsky failed to call witnesses, did not make an opening statement, conducted deficient cross-

14   examination of government witnesses, missed the significance of trial testimony, suppressed

15   exculpatory information, and failed to demonstrate that she was not involved in health care fraud.

16       The United States Supreme Court has observed that "[t]he appointed counsel manages the

17   lawsuit and has the final say in all but a few matters of trial strategy."  *Faretta v. California*, 422

18   U.S. 806, 812 (1975).  In this regard, "a lawyer may properly make a tactical determination of

19   how to run a trial in the face of his client's incomprehension or even explicit disapproval."

20   *Brookhart v. Janis*, 384 U.S. 1, 8 1966.  Thus, the control over the theory of defense to be

21   presented at trial has been left ultimately to counsel.  *See United States v. Corona-Garcia*, 210

22   F.3d 973, 977, n.2 (9th Cir. 2000) ("Even if we were to conclude that the conflict with respect to

23   trial tactics was severe, however, we would still be disinclined to reverse on that ground because

24   trial tactics are clearly within the realm of powers committed to the discretion of defense counsel

25   in any event."); *United States v. Wadsworth*, 830 F.2d 1500, 1509 (9th Cir. 1987) ("It is equally

26   clear that appointed counsel, and not his client, is in charge of the choice of trial tactics and the

27   theory of defense.

28   /////

31

1    It is true that a criminal defense attorney "has a duty to make reasonable investigations or

2    to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466

3    U.S. at 691.  However, the record shows that Karowsky's performance fell within these

4    parameters.  He reviewed the file and chose a reasonable defense based on the events as they

5    unfolded at trial, including decisions made by the government with respect to which witnesses to

6    call and which not to call.  He also interviewed possible defense witnesses.  Ultimately, he chose

7    not to call those witnesses.  Karowsky informed the trial court that he "had subpoenaed probably

8    22 witnesses, but when the Government made a tactical decision, all those are not going to be

9    used.  And I have one other witness who I've decided not to use."[7]  ECF No. 593 at 1782.

10   Reasonable tactical decisions, including decisions with regard to the presentation of the case, are

11   "virtually unchallengeable." *Strickland*, 466 U.S. at 687-90.  Further, "[t]he decision whether to

12   call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical

13   decision of the sort engaged in by defense attorneys in almost every trial." *United States v.*

14   *Nersesian*, 824 F.2d 1294, 1321 (2nd Cir. 1987).  Karowsky's decision not to call witnesses after

15   evaluating the government's presentation of its case is a reasonable tactical decision.  The fact

16   that LeChabrier may have wanted to call certain witnesses and/or present a different defense does

17   not mean that her trial counsel rendered ineffective assistance.

18        In any event, LeChabrier has failed to show that any particular witness, including FBI

19   agents, would have provided helpful testimony for the defense.  Accordingly, she has failed to

20   _____

21        [7]   With respect to that witness, Mr. Karowsky declares:

22             By reviewing my billing, I recall on April 7, 2011, I telephoned
             Attorney Von Koughnet in Santa Barbara and informed him I
23           would need him as a witness on behalf of Dr. Le Chabrier at trial
             and had him served with a trial subpoena.  Ultimately, Attorney
24           Von Koughnet informed me that after reviewing the materials Dr.
             Le Chabrier had provided him when he had consulted him, he had
25           informed Dr. Le Chabrier that he believed there was a possibility
             that Max Petrosyan was engaged in some form of fraud and that she
26           should not associate herself with him, and he would so testify at
             trial.  I finally concluded that calling Attorney Von Koughnet as a
27           witness would do more harm than any possible good for my client
             and released him from my subpoena and so informed my client.

28   ECF No. 975-16 at 9.

32

1    establish prejudice with respect to her claim that Karowsky rendered ineffective assistance in

2    failing to call trial witnesses.  *See Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir. 2001)

3    (petitioner failed to establish prejudice where he did "nothing more than speculate that, if

4    interviewed," the witness would have given helpful information); *Dows v. Wood*, 211 F.3d 480,

5    486-87 (2000) (no ineffective assistance of counsel for failure to call witnesses where petitioner

6    did not identify an actual witness, provide evidence that the witness would testify, or present an

7    affidavit from the alleged witness); *Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997) (same);

8    *United States v. Harden*, 846 F.2d 1229, 1231-32 (9th Cir. 1988) (no ineffective assistance

9    because of counsel's failure to call a witness where, among other things, there was no evidence in

10   the record that the witness would testify); *United States v. Berry*, 814 F.2d 1406, 1409 (9th Cir.

11   1987) (appellant failed to meet prejudice prong of ineffectiveness claim because he offered no

12   indication of what potential witnesses would have testified to or how their testimony might have

13   changed the outcome of the hearing).  Without direct evidence that specific witnesses would have

14   testified in a manner that might have led to a different result at trial, LeChabrier's allegations are

15   insufficient to support her claim that Karowsky's failure to investigate witnesses constituted

16   ineffective assistance of counsel.  LeChabrier's speculation as to what uncalled witnesses would

17   have testified to is insufficient to establish prejudice.  The same is true of Karowsky's alleged

18   failure to effectively cross-examine government witnesses.  LeChabrier has failed to show that

19   more or different cross-examination questions would have changed the outcome of the trial.

20        With regard to counsel's decision not to make an opening statement, "[t]he timing of an

21   opening statement, and even the decision whether to make one at all, is ordinarily a mere matter

22   of trial tactics and in such cases will not constitute the incompetence basis for a claim of

23   ineffective assistance of counsel."  *United States v. Rodriguez–Ramirez*, 777 F.2d 454, 457 (9th

24   Cir. 1985).  The decision to waive opening argument "is essentially tactical in nature and is not

25   objectively unreasonable."  *Huffington v. Nuth*, 140 F.3d 572, 583 (4th Cir. 1998) (internal

26   citations omitted); *see also United States v. Haddock*, 12 F.3d 950, 955 (10th Cir. 1993) (the

27   failure to present an opening statement itself is not ineffective assistance of counsel).  LeChabrier

28   has failed to show that Karowsky's decision not to make an opening statement was not a tactical

1  decision, nor has she shown a reasonable probability of a different outcome had Karowsky made

2  an opening statement.

3         LeChabrier also claims Karowsky delivered a false and inaccurate closing statement

4  because he lacked sufficient knowledge of the case to present an accurate rendering of the events.

5  This court has reviewed Karowsky's closing statement.  There is no evidence that Karowsky

6  made false statements, had an insufficient grasp of the facts, improperly insinuated that

7  LeChabrier was guilty, or failed to tell the jury she was unaware of the Burbank clinic.  On the

8  contrary, Karowsky specifically stated that LeChabrier did not know about the Burbank clinic.

9  *See* ECF No. 594 at 52 ("there is no evidence that Dr. LeChabrier ever knew about the Burbank

10  clinic"); *Id.* at 58 ("There's nothing to show that she knew about Burbank.  And if you take a look

11  at the signatures, there's questions as to whether or not that signature on the Burbank app, as I

12  said before, is forged").  The court also notes that Karowsky declares he met with LeChabrier

13  three times on the day before giving his closing argument, and that he provided her with a

14  complete copy of that argument.  ECF No. 975-16 at 9-10.  Karowsky declares that "[a]lthough I

15  ultimately incorporated a few of her suggestions into my closing argument, most of her requests

16  dealt with arguing information which was not in evidence and/or legally, factually, tactically,

17  and/or ethically, I could not do and I so informed her."  *Id.* at 10.  Under these circumstances,

18  LeChabrier has failed to demonstrate that Karowsky rendered ineffective assistance in connection

19  with his closing argument.

20         In sum, there is no evidence, and LeChabrier has not demonstrated, that any error by

21  attorney Karowsky "infected [her] entire trial with errors of constitutional dimension."  *White*,

22  874 F.2d at 603.   Accordingly, her claim in this regard must be denied.

23  **IV.  Other Motions filed by LeChabrier**

24         **A.  Motion for Default Judgment**

25         On November 2, 2015, LeChabrier filed a motion for default judgment, arguing that the

26  government failed to file an answer to her § 2255 motion in a timely manner.  ECF No. 971.  She

27  is mistaken.

28  /////

1    The government was directed to file an answer to LeChabrier's § 2255 motion by October

2    30, 2015.  ECF No. 964.  On October 28, 2015, the government timely filed a motion for

3    extension of time to file an answer.  ECF No. 967.  That request was granted on November 13,

4    2015, and the government was directed to file its answer by November 20, 2015.[8]  ECF No. 972.

5    The government timely filed its answer on November 20, 2015.  ECF No. 974.  Accordingly,

6    LeChabrier's motion for default judgment must be denied.

7    **B.  Motion for "Equal Time"**

8    On June 22, 2015, LeChabrier filed a motion for "equal time."  ECF No. 952.  Her motion

9    is stated, in full, as follows:

10   > Plaintiff objects to a court hearing of June 28, 2015; plaintiff has
     > not *seen*, let alone had time to reply to, government's ANSWER.
11   > Plaintiff hereby asks the Court to grant her EQUAL TIME, to wit:
     > *time to reply* to government's answer, when and if it is produced,
12   > _equal to_ time taken for government to ANSWER.  And asks that any
     > hearing be delayed until such time.
13

14   *Id.*

15   The court issued an order on June 17, 2015, which, among other things, continued the

16   hearing on the government's motion for an order finding a waiver of the attorney-client privilege

17   to July 22, 2015.  That hearing took place on July 22, 2015, as ordered.   There is no June 28,

18   2015 hearing date listed on the docket.  To the extent LeChabrier's motion is referring to the July

19   22, 2015 hearing, her request for a delay of that hearing is denied as moot.

20   The government's answer was filed on November 20, 2015, and LeChabrier's two reply

21   briefs were filed on March 25, 2016, and August 8, 2016.  Accordingly, LeChabrier's request for

22   time to file a reply is also denied as moot.

23   **C.  Motion for Transcripts and Documents**

24   On June 1, 2015, LeChabrier filed a "motion to request transcripts and documents."  ECF

25   No. 947.  Therein, she requests that she be provided with certain unspecified documents.

26   /////

27

28   ---
     [8] LeChabrier filed her motion for default judgment on November 2, 2015.  ECF No. 971.

LeChabrier explains that after she asked attorney Wiseman for his records he "referred plaintiff to Mr. Karowsky," who in turn gave LeChabrier "selected records of selected elements . . . retrospectively compiled after trial on electronic media." *Id.* at 1.  She also explains that Karowsky gave attorney Daly three "large plastic bags" containing "important and irreplaceable records," but she later learned that this material had been "destroyed." *Id.*  Attorney Daly later gave LeChabrier the records that she had "kept." *Id.*  LeChabrier states that she has learned none of her attorneys kept "hard copy records." *Id.*  LeChabrier asks that this court order the government to produce a number of "original" documents supporting the charges against her that were "not produced in discovery or at trial."  LeChabrier states that she needs this information in order to support her "appeal." *Id.*

To the extent LeChabrier is referring to her direct appeal, the Ninth Circuit ruled on that appeal prior to the time this motion was filed.  Accordingly, any request for records to support her appeal will be denied.  To the extent LeChabrier is referring to documents to support the instant § 2255 motion, LeChabrier has already filed two opposition briefs without the benefit of these "records."  It also appears that all the records LeChabrier is seeking have either been destroyed or given to her.  Under these circumstances, LeChabrier has not demonstrated a need for any records that she doesn't already have.  Accordingly, this motion is denied.

## V. Conclusion

Accordingly, IT IS HEREBY ORDERED that:

1.  LeChabrier's motion "for equal time" (ECF No. 952) is denied; and

2.  LeChabrier's motion for transcripts and documents (ECF No. 947) is denied.

Further, IT IS RECOMMENDED that:

1.  LeChabrier's motion for default judgment (ECF No. 971) be denied;

2.  LeChabrier's motion vacate, set aside, or correct her sentence pursuant to 28 U.S.C. § 2255 (ECF No. 928) be denied; and

3.  The Clerk be directed to close the companion civil case, No. 2:12-cv-0011-MCE-EFB.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

1   after being served with these findings and recommendations, any party may file written

2   objections with the court and serve a copy on all parties.  Such a document should be captioned

3   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

4   shall be served and filed within fourteen days after service of the objections.  Failure to file

5   objections within the specified time may waive the right to appeal the District Court's order.

6   *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir.

7   1991).  In his objections movant may address whether a certificate of appealability should issue in

8   the event he files an appeal of the judgment in this case.  *See* Rule 11, Rules Governing Section

9   2255 Cases (the district court must issue or deny a certificate of appealability when it enters a

10   final order adverse to the applicant).

11   DATED:  December 21, 2016.

12                                            EDMUND F. BRENNAN
13                                            UNITED STATES MAGISTRATE JUDGE

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28